## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO EASTERN DIVISION

| Joan Lee Ross, et al., | : | |
| Plaintiffs, | : | |
| -vs- | : | Case No. 2:12-cv-0743 |
| Home Depot U.S.A. Inc., et al., | : | Judge Smith |
| Defendants. | : | Magistrate Judge Kemp |

## DEFENDANT HOME DEPOT U.S.A. INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Home

Depot U.S.A., Inc., ("Home Depot") requests that the Court grant it summary judgment

as to plaintiffs' claims for punitive damages and moves the Court to enforce the

statutory, non-catastrophic damage caps with respect to the plaintiffs' injuries. In

support of this Motion, Home Depot submits the following:

### I. Background

This is a personal injury case involving a trip and fall at a Home Depot store.

Plaintiff Joan Lee Ross fell on June 26, 2012 when she tripped over an extension cord

that had been secured to the floor by a display of electric fans. Plaintiff James Ross

alleges a loss of consortium.

### II. Summary Judgment Standard

In *Pitcher v. Waldman*, 2012 U.S. Dist. LEXIS 152087, 11-13, (S.D. Ohio 2012),

this Court summarized the applicable summary judgment standard: In considering a

motion for summary judgment, "a court must view the facts and any inferences that can

be drawn from those facts ... in the light most favorable to the nonmoving party."[1] "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"[2] The requirement that facts be construed in the light most favorable to the nonmoving party, however, does not mean that the court must find a factual dispute where record evidence contradicts wholly unsupported allegations. "The 'mere possibility' of a factual dispute is not enough."[3]

Further, in order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint.[4] Although reasonable inferences must be drawn in favor of the opposing party, inferences are not to be drawn out of thin air.[5] To demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts ....."[6]

In this case, there are no genuine issues of material fact that Home Depot did not act with malice or a conscious disregard for the safety of Ms. Ross when it secured the cord to the floor, and thus punitive damages are not warranted. In addition, because there is no genuine issue of material fact that Ms. Ross did not suffer a permanent and substantial physical deformity, her noneconomic compensatory damages are capped.

---

[1] *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007)(internal quotation marks and additional citations omitted)

[2] *Id.* (quoting Fed.R.Civ.P. 56(c), internal quotation marks omitted).

[3] *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).

[4] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L. Ed. 2d 202 (1986).

[5] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

[6] *Id.* (additional citation omitted).

Therefore, summary judgment on these issues must be entered for Home Depot as a matter of law.

### III. Plaintiffs' Unfounded Claim for Punitive Damages.

Plaintiffs, in Doc # 34, sought leave to amend the complaint to add claims for recklessness and/or willful and wanton misconduct, based on two factual claims. First, Plaintiffs assert that "no hazards or problems were ever identified on a single form for the Kitchen & Bath department in the weeks prior to the incident in question." Second, Plaintiffs contend that "Home Depot's policies and guidelines regarding in-store displays mandate that '[n]o extension cords may be used,' a policy which (Plaintiffs allege) was clearly disregarded leading to the incident in question." Both factual claims are without merit and to rebut both of these assertions, Home Depot provided factual references to the record in its motion in opposition to Plaintiffs' leave to amend. The Court, given the low bar to amend the complaint, elected to allow the amendment of the complaint, filed as Doc # 44.

In doing so, the Court stated "[u]ltimately, it appears to the Court that the question of whether punitive damages will be an issue in this case will be a matter likely to be resolved, at least initially, through summary judgment, when the entire factual record can be presented to the Court." Doc # 43. That day has come, and there is nothing within the entire factual record to support a cognizable claim for punitive damages.

### IV. Punitive Damages Standard.

Plaintiffs allege that "[d]efendant's conduct and omissions evidenced a conscious and outrageous disregard for the safety of others," including Joan Lee Ross. Doc # 44

3

at ¶¶17-18. When proceeding on the "conscious disregard" definition of malice under *Preston v. Murty*, 32 Ohio St. 3d 334, 512 N.E.2d 1174, 1176 (Ohio 1987), a punitive damages claim requires proof of the defendant's subjective knowledge of the danger posed to another by his conduct. *Malone v. Courtyard by Marriott L.P.* (1996), 74 Ohio St.3d 440, 659 N.E.2d 1242. "Since punitive damages are assessed for punishment and not compensation, the element of conscious wrongdoing is always required. This element has been termed conscious, deliberate or intentional. It requires the party to possess knowledge of the harm that might be caused by his behavior." *Preston*, 32 Ohio St.3d at 335, 512 N.E.2d 1174.

"[A]ctual malice requires consciousness of the near certainty (or otherwise stated 'great probability') that substantial harm will be caused by the tortious behavior. Any less callous mental state is insufficient to incur that level of societal outrage necessary to justify an award of punitive damages. Therefore, it is evident that a reckless actor, who only has knowledge of the mere possibility that his or her actions may result in substantial harm, is not behaving maliciously." *Motorists Mut. Ins. Co. v. Said* (1992), 63 Ohio St.3d 690, 698, 590 N.E.2d 1228, overruled in part, citations omitted.

### V. The Store Readiness Checklists Demonstrate Home Depot's Commitment to Safety.

Plaintiffs previously claimed that Home Depot's Kitchen & Bath department records, specifically the Store Readiness Checklist Survey filled out every morning "indicated that no hazards or problems were ever identified on a single form for the Kitchen & Bath department in the weeks prior to the incident in question." (See Doc # 34 at p. 2). This claim is demonstrably false. Home Depot's documents demonstrate that on some days, 4/16/12, 4/26/12, 4/27/12, 5/1/12, 5/9/12, 5/15/12, 5/22/12, 5/23/12

4

and 6/3/12, prior to opening the store each morning, its associates found the department was not in conformance with department requirements. (See HD0222, HD0272, HD0277, HD0297, HD0338, HD0369, HD0403, HD0408, and HD0073, attached hereto as Exhibit A.)

Plaintiffs' claim also ignores the testimony in this case that it was not uncommon for associates to indicate "y" on the checklist if they were able to immediately bring a noted issue into conformity, e.g., with respect to "no leaning or protruding merchandise," an associate may push the item back into the shelf, and then note that the department was free of such issues, and enter "n" only with respect to issues that may take additional time or effort to correct, such as "all front beams bolted to uprights." *See*, e.g., Hansberry Dep. at p. 103. (See also, *Id.* at p. 106: Q. "Sometimes they would still put "yes" because they picked up the hammer and put it on the shelf and didn't bother, then, putting in all the information? A. Right.").

In sum, the record demonstrates that Home Depot's associates noted issues on the Store Readiness Checklists leading up to the incident. If plaintiffs claim that the number of noted issues is low, the testimony in the case explains that some associates corrected simple items when observed and then entered a "y" onto the checklist. The plaintiffs' claims regarding the checklists are factually wrong and completely fail to establish a basis for punitive damages. The most that can be said is that the subject cord was not noted on any of the checklists. But as set forth below, this is simply the result of no employee considering the cord to have been a trip hazard prior to the incident.

### VI. Plaintiffs' Contention Home Depot "Violated" Policy by Use of the Cord Does Not Support an Award of Punitive Damages.

There is no specific Home Depot procedure that prohibits securing a cord to the store floor. There are limitations on using an extension cord anywhere within the store because of concerns about a fire hazard.

The directive to employees regarding extension cords at p. 56 (HD0451) of the Asset Protection Guide ("APG", Doc #40) is found in the Merchandise Safety chapter, and a review of the subject page demonstrates that it is concerned not with extension cords as a trip hazard, but rather as an electrical/fire hazard. The very bullet point cited by plaintiffs in their motion to amend reads, in full:

- No extension cords may be used. Electrical power supplies for any displays must be hard-wired.

The very same page provides for the use of power strip <u>with a cord</u> in the event that a display cannot be directly plugged into a professionally installed outlet. The Store Readiness Checklist Survey actually has a query: "Extension cords/adaptors undamaged and not used for more than 24 hours continuously," suggesting that even the use of an extension cord is not, *per se*, a violation of Home Depot's policies. See Exhibit B attached, p. HD0034.

Plaintiffs have deposed Home Depot employees Bianca Hansberry, Nancy Bendoff, Stephen J. Kelley, Jr., Lisa Young, Alan Mansfield, Shannon Maxwell, and Timothy Wightman.[7] Not one believed, prior to the incident, that the cord on the floor constituted a trip hazard. Instead, and consistent with the APG, the concern was a fire hazard.

---

[7] Filed separately, relevant pages attached hereto.

Shannon Maxwell testified that: "[w]e could not use extension cords because of fire marshall [sic] reasons was the main concern." Dep. p. 24-25. "I mean we worry about the heat that produces on an extension cord and the fact it doesn't shut down when there's a surge." Dep. p. 60. "They could use a power strip and still energize it across the floor so long as it was on a power strip." Dep. p. 63-64.

Timothy Wightman was asked: "Q: And is it your understanding that that policy is for safety purposes? A. That's to keep the cord from overheating. Yes, sir." Dep. p. 43.

All of the electrical cord proscriptions on p. 56 address avoiding an electrical overload, not avoiding a trip hazard, i.e. power strips differ from extension cords in that power strips contain a fuse to prevent an overload. More to the point, had the cord at issue terminated in a hard-wired connection, instead of a plug, it would have been in full compliance with the directive on page 56.

It is clear that nothing on page 56 prohibits placing a cord (whether from a fan, or a hard-wired display, or a cord from a power strip), on the floor or securing it with duct tape, and there is no prohibition anywhere within the APG that explicitly prohibits the use of a cord on the display floor.

A claimed violation of Page 56's directives regarding the nature of connections to the electrical system, therefore, does not give rise to any claim to punitive damages. Additionally, even if Home Depot violated a company policy, relative to the accident, at best, this is an allegation of negligence and based on the record, there is no showing of culpable mindset to support a punitive claim.

7

**VII.    No Evidence Exists to Support a Claim that Home Depot was Aware of a Trip Hazard Prior to the Incident.**

None of the Home Depot employees testified that they believed the cord constituted a trip hazard prior to the plaintiffs' incident. None of the Home Depot employees testified that they were aware of any trips on the cord prior to the plaintiffs' incident. Home Depot produced all of its records regarding reported falls and there are no records with reference to the cord, other than the plaintiffs' incident. See Ex. C and Doc # 77 p. 8.

To the contrary, Shannon Maxwell who was the team leader for the MET (Merchandise Execution Team) that installed the display was asked: "Q. Did you think about the fact that it could be a trip hazard? A. No." Dep. p. 67.[8] She likewise testified that if she any safety concerns, she could have expressed those to the store manager. Dep. p. 83.

To Timothy Wightman's knowledge, no one reported the cord as a hazard to him or to anyone prior to the incident. Dep. p. 57. He had no recollection of the cord being in place until the incident. Dep. p. 56. And it is only in hindsight that Mr. Wightman recognizes that there might have been a safer alternative to the arrangement of the cord. Dep. p. 55.

Nancy Bendoff was aware that the cord was in place, but felt that it was adequately secured for safety standards. Dep. p. 73. She had not been told of any prior occasions of someone tripping on the cord. Dep. p. 76.

Stephen Kelley never reported the cord as a dangerous condition and was unaware of any customers making any complaints regarding the cord prior to the

---

[8] Ms. Maxwell had aesthetic concerns regarding the cord.

incident. Dep. p. 33.

Alan Mansfield never had the cord as a trip hazard brought to his attention by either a daily inspection or any other means. Dep. p. 33. He didn't believe the cord constituted a trip hazard prior to the incident. Dep. p. 38.

Bianca Hansberry has successfully used extension cords across aisles in her prior retail employment (Dep. p. 70) and she did not find the cord hard to discern on the floor. Dep. p. 71.

There is simply no evidence in the record to support a claim that Home Depot or its employees had knowledge prior to the incident that the cord could pose a trip hazard and failed to act.

### VIII. The Record Demonstrates that Safety is a High Priority to Home Depot and its Employees.

Bianca Hansberry, Nancy Bendoff, Stephen J. Kelley, Jr., Alan Mansfield, Shannon Maxwell, and Timothy Wightman[9] were all deposed at length as to their beliefs regarding customer safety. A very brief sampling of that testimony follows:

**Alan Mansfield** at Dep. p. 34:

Q.     Would you agree that all of the associates at Home Depot should be on the lookout for conditions that could harm customers?

A.     Yes.

**Bianca Hansberry** at Dep. p. 40:

Q.     And would you agree that at Home Depot, it was important to maintain a safe and profitable work and shopping environment for, among others, customers?

A.     Yes.

---

[9] Lisa Young was deposed but not asked questions regarding customer safety.

**Stephen Kelly** at Dep. p. 27:

Q.     At Home Depot, is customer safety one of the top concerns?

A.     It is.

**Nancy Bendoff** at Dep. p. 24:

Q.     Would you agree with me...that customer safety should always be a
       primary consideration?

A.     100 percent.

**Timothy Wightman** at Dep. p. 32:

Q.     [W]ould you agree that safety is the number one priority while shopping
       and working in stores?

A.     Yes Sir.

**Shannon Maxwell** at Dep. p. 91:

Q.     Would you agree that Home Depot should always do its best to reduce the
       risk of customer injury?

A.     We – we strive for that, yes.

**IX. Discussion.**

Trip-and-fall premises liability cases are almost always inappropriate for an

award of punitive damages. A. Hawkins, *Balancing Act: Public Policy and Punitive*

*Damages Caps*, 49 S.C. L.Rev. 293, 303 (1998) (noting punitive damages awards to be

"particularly rare" in premises liability cases).

In *Corea v. Toys "R" Us*, 1993 Ohio App. LEXIS 6006, 8th Dist. Cuyahoga No.

63073 (Dec. 16, 1993), the plaintiff, while carrying her infant son, slipped and fell on ice

on the sidewalk in front of the defendant store. At trial, the court directed verdict for

defendant on plaintiff's claim for punitive damages where plaintiff "introduced no

evidence that [defendant] caused the slip and fall of [plaintiff] with any malice, fraud,

oppression or insult. There was no showing of any misconduct greater than negligence, or of a great probability of substantial harm."

In *Wal-Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 327 (Tex.1993), the court reversed the award of punitive damages to plaintiff who fell outside of store through tripping on 5/8" ridge at the base of a concrete ramp leading from the parking lot to the sidewalk in front of store. The court held "there is no evidence that Wal-Mart's conduct created an extreme risk of harm. The store had averaged 50,000 patrons per month in the three months it had been open before [plaintiff's] accident. There was no evidence that anyone had tripped and fallen over the ridge before she did, and evidence that only one person * * * had as much as stumbled there. * * * The negligent failure to warn of or repair timely this defect simply did not impose an extreme risk creating the likelihood of serious injury."

Here, the evidence is that the installation of the fan display occurred between April 9, 2012 and April 20, 2012 (Maxwell Dep. p. 50) and that there were no reported incidents of anyone tripping on the cord until Ms. Ross, approximately 55-77 days later. Thus, there is no basis to assert that Home Depot kept the cord in place after notice of the risk from a separate incident, in conscious disregard of the safety of Ms. Ross. Likewise, the allegation that the cord being secured in the aisle violated company policy does not stand scrutiny. At best, the manner in which the cord connected to the electrical service could have been a violation of policy, depending upon the length of time it was connected, but there is no specific prohibition against the securing of the cord in an aisle way. See, e.g. Maxwell Dep. p. 63-64 (could use a power strip and still energize it across the floor).

11

Rather than Home Depot exhibiting conscious disregard, the testimony of its employees not only reinforces the fact that the cord was not considered to pose a risk prior to the plaintiffs' incident, but that the Home Depot mindset is customer safety. While it will be for a jury to determine whether Home Depot may have been negligent in carrying out that mindset, this Court should grant summary judgment as to the plaintiffs' punitive damages claim as there is a complete lack of any testimony to support a claim that Home Depot acted in conscious disregard of Ms. Ross' safety.

### Plaintiffs' damages are capped by R.C. 2315.18(B)(2).

Ohio imposes limitations on noneconomic compensatory damages. R.C. 2315.18(B)(2) provides a cap of the greater of two hundred fifty thousand dollars or an amount that is equal to three times the economic loss, as determined by the trier of fact, of the plaintiff in that tort action to a maximum of three hundred fifty thousand dollars for each plaintiff in that tort action or a maximum of five hundred thousand dollars for each occurrence that is the basis of that tort. The only exclusion to this limitation is found in R.C. 2315.18(B)(3) that states:

> "[t]here shall not be any limitation on the amount of compensatory damages that represents damages for noneconomic loss that is recoverable in a tort action to recover damages for injury or loss to person or property if the noneconomic losses of the plaintiff are for either of the following: (a) Permanent and substantial physical deformity, loss of use of a limb, or loss of a bodily organ system; (b) Permanent physical functional injury that permanently prevents the injured person from being able to independently care for self and perform life-sustaining activities."

Ms. Ross had injuries to her leg, knee, and shoulder. Ms. Ross testified that her knee is fine when sitting, but gets extremely sore when walking. Dep. p. 38. Her foot will swell when she walks. Id. Ms. Ross uses a cane on some occasions but can walk

12

without it. Dep. p. 40. She has increased complaints of pain with increased activity levels. *Id.* She has difficulty getting down to garden and in entering and exiting her pool. Dep. p. 40-41.

Ms. Ross complains of a limited range of motion with regard to her shoulder. Dep. p. 42. She has no shoulder pain, but does have pain in her upper arm. *Id.*

Ms. Ross describes her physical therapy as including "[T]he bike, the elliptical. Different things they were trying to do for my arm like a ladder, climbing ladder. I had the [sic] try to climb a ladder." Dep. p. 53.

Ms. Ross picks up and straightens up around the house. Dep. p. 58. She makes the bed. *Id.* She doesn't clean the floors or do the laundry. *Id.* She drives. Dep. p. 61-62. She can dress herself. James Ross Dep. p. 56.

Ms. Ross has surgical scars but in reference to her shoulder states: "I have some, but it's not -- it's not bad. He did a phenomenal job." Dep. p. 49. In reference to her leg and knee, she states: "I have one cross...I don't know. Do you want to see it? You can see it.*** It's not that bad." Dep. p. 50.

In *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948 (Ohio 2007), ¶¶ 40, 47, the Supreme Court of Ohio held that R.C. 2305.18's non-economic damages caps are to be disregarded only for "the most serious" or "catastrophic" injuries. *See also Oliver v. Cleveland Indians Baseball Co. Ltd. P'ship*, 123 Ohio St.3d 278, 2009-Ohio-5030, ¶ 6 ("R.C. 2315.18(B) contains an exception to the limits on noneconomic damages for those persons who suffer 'catastrophic injuries'[.]"); *Sheffer v. Novartis Pharms. Corp.*, 2014 U.S. Dist. LEXIS 72946, *5 "The statutory cap on

13

damages is lifted only for injuries that are 'catastrophic' in nature. * * * Any physical deformity must be 'severe and objective.'").

In *Weldon v. Presley*, No. 1:10 CV 1077, 2011 U.S. Dist. LEXIS 95248 (N.D. Ohio Aug. 9, 2011), *adopted at* 2011 U.S. Dist. LEXIS 95247 (N.D. Ohio Aug. 25, 2011), the court granted defendant's motion for summary judgment requesting application of the non-economic damages caps where plaintiff suffered injuries to her head, neck, shoulders, and back -- including a surgical scar -- from an auto accident. The court, citing *Arbino,* held that as a matter of law the scar was not a "substantial physical deformity," and that plaintiff's inability to operate a vacuum, move furniture, and perform yard maintenance did not "prevent [her] from caring for herself." The court explained as follows:

> Mary Weldon's injuries are not the type exempt from the damages cap. The Ohio Supreme Court in *Arbino* characterized the injuries not subject to the damages cap as "catastrophic." While the General Assembly does not mention them as so, it seems appropriate given both the Ohio Supreme Court's interpretation and the plain language of the statute.
>
> Although no specific definition accompanied Ohio Revised Code § 2315.18(B)(3)(a) for "permanent and substantial physical deformity," the injuries listed help qualify the level of injury suffered.
>
> "Loss of use of a limb" appears fairly straight forward. The Merriam Webster Dictionary defines a limb as a "leg or arm" of a human being. No longer being able to use an arm or leg certainly seems like a significant injury that the Ohio General Assembly had in mind when creating the exceptions to the damages cap. The United States District Court for the Southern District of Ohio defined "loss of bodily organ system" in a recent decision. [*Williams v. Bausch & Lomb Co.*, No. 2:08-cv-910, 2010 U.S. Dist. LEXIS 62018 (S.D. Ohio June 22, 2010) (Smith, J.)]. There the court held that the complete loss of sight in one eye fell short of a loss of bodily organ system. **In order for the plaintiff to have suffered a loss of bodily organ system, she needed to have lost complete use of her "ocular system," which she had not, as she was able to see partially out of her other eye.[10]** Given the extreme qualifications required for

---

[10] Emphasis added.

14

the other injuries listed, it seems clear that permanent and substantial physical deformity must be severe and objective.

The court captioned the second part of its discussion as follows:

> **As a matter of law, Mary Weldon did not suffer permanent physical functional injury that prevents her from being able to independently care for self and perform life sustaining activities. Despite not being able to perform certain household chores, Mary Weldon is still able to care for herself and perform life sustaining activities.[11]**

In reaching this decision the court stated:

> In response, the Weldons point to Mary's deposition that she can no longer perform certain tasks as a result of the accident: "running a sweeper, moving furniture around in her home, and performing yard maintenance including weed whacking and cutting the grass." As a matter of law, these limitations will not exclude Mary Weldon from the statutory damages cap. The statute requires that Mary's injuries prevent her from caring for herself. Her inability to do these household chores, however, is insufficient to defeat the damages cap. (Emphasis added.)

Like Mary Weldon, Ms. Ross was injured, underwent surgery, has surgical scars, and has some limitations on her activities of daily living. But she has not suffered a permanent and substantial physical deformity, loss of use of a limb, or loss of a bodily organ system. Nor has she suffered a permanent physical functional injury that prevents her from being able to independently care for herself and perform life-sustaining activities. At the time of her deposition, Ms. Ross cared for herself, with peripheral assistance of her husband. As a result, this Court should enforce the statutory cap on non-economic damages, limiting the total of such damages to a maximum of three hundred fifty thousand dollars for each plaintiff, subject to a maximum of five hundred thousand dollars for this occurrence.

---

[11] Bold in the original.

## X. Conclusion.

Wherefore, Defendant Home Depot respectfully requests that the Court grant it partial summary judgment as to plaintiffs' punitive damages claim and hold that Ohio's cap on non-economic damages applies to plaintiffs' claims.

Respectfully submitted,
**LANE, ALTON & HORST LLC**

/s/ Joseph A. Gerling

Joseph A. Gerling        (0022054)
Trial Attorney for Defendant
Home Depot U.S.A., Inc.
Edward G. Hubbard        (0067784)
Two Miranova Place, Ste. 500
Columbus, Ohio 43215-7052
614-228-6885
614-228-0146 fax
jgerling@lanealton.com
ehubbard@lanealton.com
Of Counsel
Attorneys for Home Depot U.S.A., Inc.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing was served on all counsel on the date so indicated by the electronic service system.

/s/ Joseph A. Gerling

Joseph A. Gerling        (0022054)
Edward G. Hubbard        (0067784)

# EXHIBIT A

Store Readiness Checklist Survey
Store: 6954-GROVE CITY
Survey Date: 4/16/2012

Approved: Yes
Approved By: DPB96J
Approved Time: 9:39:06

D27 Electrical / Lighting

D28 Inside Garden

D28 Outside Garden

**CONFIDENTIAL**

| D29 Kitchen & Bath | | | | | |
|---|---|---|---|---|---|
| | Aisles clear of empty pallets, debris, and water. | WFG3TX | Y | Y | 30013 - Fixed |
| | No leaning or protruding merchandise. | WFG3TX | Y | | |
| | Merchandise restraints used per safety standards | WFG3TX | Y | | |
| | Palletized freight in overhead wrapped or banded to pallet. | WFG3TX | Y | | |
| | Hand stacked merchandise in overhead stable and no higher than 4ft. | WFG3TX | Y | Y | 31004 - Taped box |
| | All front beams bolted to uprights | WFG3TX | Y | | |
| | Flue spaces clear. | WFG3TX | Y | | |
| | Nothing hung from sprinklers and at least 18in between overhead sprinklers and storage below. | WFG3TX | Y | | |
| | Fire extinguishers unblocked & mounted | WFG3TX | Y | | |
| | Extension cords/adaptors undamaged and not used for more than 24 hours continuously. | WFG3TX | Y | | |
| | Vanities are secured (cabinet thru-bolted to rack or fixture & sink top siliconed to cabinet) | WFG3TX | Y | | |

page 3 of 5

HD0222

Store Readiness Checklist Survey
Store:  6954:GROVE CITY
Survey Date:    4/26/2012

Approved:  Yes
Approved By:  DPB99J
Approved Time:   9:38:21

D27 Electrical / Lighting

D28 Inside Garden

**CONFIDENTIAL**

D28 Outside Garden

D29 Kitchen & Bath    Aisles clear of empty pallets, debris, and water.

AXN4996    N    N

merch, chest freezer, microwave
and cabinets on floor in aisle 33; re-
bath walkin display blocking back
wall aisle; pallet of merch on floor in
back aisle

page 3   of 5

HD0272

Store Readiness Checklist Survey
Store: 6954;GROVE CITY
Survey Date: 4/27/2012

Approved: Yes
Approved By: TW28II
Approved Time: 9:23:14

D27 Electrical / Lighting

D28 Inside Garden

D28 Outside Garden

# CONFIDENTIAL

| D29 Kitchen & Bath | Aisles clear of empty pallets, debris, and water | | | | five large freight items on floor in aisle 33 that should have been pul up in overhead or shelving using op lift items are blocking both sides of aisle (floor) and blocking access to merch on both sides. |
|---|---|---|---|---|---|
| | | AXN4996 | N | N | |
| | No leaning or protruding merchandise. | AXN4996 | Y | | |
| | Merchandise restraints used per safety standards | AXN4996 | Y | | |
| | Palletized freight in overhead wrapped or banded to pallet. | AXN4996 | Y | | |

page 3 of 5

HD0277

**Store Readiness Checklist Survey**
Store: 6954 GROVE CITY
Survey Date: 5/1/2012

Approved: Yes
Approved By: DPB98J
Approved Time: 9:55:07

D27 Electrical / Lighting

D28 Inside Garden

D28 Outside Garden

**CONFIDENTIAL**

| D29 Kitchen & Bath | Aisles clear of empty pallets, debris, and water. | MB88F5 | | | |
| | No leaning or protruding merchandise. | MB88F5 | Y | Y | box leaning against shelf aisle 25--fixed |
| | Merchandise restraints used per safety standards. | MB88F5 | Y | | |
| | Palletized freight in overhead wrapped or banded to pallet. | MB88F5 | Y | | |
| | Hand stacked merchandise in overhead stable and no higher than 4ft | MB88F5 | Y | | |
| | All front beams bolted to uprights. | MB88F5 | Y | | |
| | Flue spaces clear | MB88F5 | Y | | |

HD0297

Store Readiness Checklist Survey
Store: 6954:GROVE CITY
Survey Date: 5/9/2012

Approved: Yes
Approved By: DPB99J
Approved Time: 8:42:07

D27 Electrical / Lighting

D28 Inside Garden

CONFIDENTIAL

D28 Outside Garden

D29 Kitchen & Bath

| | | | | |
|---|---|---|---|---|
| Aisles clear of empty pallets, debris, and water. | TRP6521 | N | N | cabs in aisles 33 left from night crew in middle of aisle |
| No leaning or protruding merchandise. | TRP6521 | Y | | |
| Merchandise restraints used per safety standards | TRP6521 | Y | | |
| Palletized freight in overhead wrapped or banded to pallet. | TRP6521 | Y | | |
| Hand stacked merchandise in overhead stable and no higher than 4ft | TRP6521 | Y | | |
| All front beams bolted to uprights | TRP6521 | Y | | |
| Flue spaces clear. | TRP6521 | Y | | |

page 3   of 5

HD0338

Store Readiness Checklist Survey
Store: 6954:GROVE CITY
Survey Date: 5/15/2012

Approved: Yes
Approved By: DPB99J
Approved Time: 9:56:03

| D29 Kitchen & Bath | Aisles clear of empty pallets, debris, and water. | TFH3122 | Y | Y | aisle 33 misc vanities thru out lane |
|---|---|---|---|---|---|
| | | | | | fix: put them away |
| | No leaning or protruding merchandise. | TFH3122 | Y | Y | aisle 31 boxes pushing on netting |
| | | | | | fix :push boxes in |
| | Merchandise restraints used per safety standards | TFH3122 | Y | | |
| | Palletized freight in overhead wrapped or banded to pallet. | TFH3122 | Y | | |
| | Hand stacked merchandise in overhead stable and no higher than 4ft. | TFH3122 | Y | | |
| | All front beams bolted to uprights. | TFH3122 | Y | | |
| | Flue spaces clear. | TFH3122 | Y | | |
| | Nothing hung from sprinklers and at least 18in between overhead sprinklers and storage below. | TFH3122 | Y | | |
| | Fire extinguishers unblocked & mounted | TFH3122 | Y | | |
| | Extension cords/adaptors undamaged and not used for more than 24 hours continuously | TFH3122 | Y | | |
| | Vanities are secured (cabinet thru-bolted to rack or fixture & sink top siliconed to cabinet) | TFH3122 | Y | | |

D30 Millwork

# CONFIDENTIAL

D42 Pro Desk / D78 TRC

D59 Decor

**HD0369**

Store Readiness Checklist Survey
Store: 8954;GROVE CITY
Survey Date: 5/22/2012

Approved: Yes
Approved By: DPB99J
Approved Time: 9:09:27

D27 Electrical / Lighting

D28 Inside Garden

D28 Outside Garden

CONFIDENTIAL

| D29 Kitchen & Bath | Aisles clear of empty palets, debris, and water. | DPB99J | Y | Y | 3 cabinets left in 33 bt freight team again Fixed |
| | No leaning or protruding merchandise. | DPB99J | Y | | |
| | Merchandise restraints used per safety standards. | DPB99J | Y | | |
| | Paletized freight in overhead wrapped or banded to pallet. | DPB99J | Y | | |
| | Hand stacked merchandise in overhead stable and no higher than 4ft. | DPB99J | Y | | |
| | All front beams bolted to uprights. | DPB99J | Y | | |
| | Flue spaces clear. | DPB99J | Y | | |
| | Nothing hung from sprinklers and at least 18in between overhead sprinklers and storage below. | DPB99J | Y | | |
| | Fire extinguishers unblocked & mounted. | DPB99J | Y | | |

**HD0403**

Store Readiness Checklist Survey
Store:  6954:GROVE CITY
Survey Date:    5/23/2012

Approved:  Yes
Approved By:  DPB99J
Approved Time:    10:00:13

D27 Electrical / Lighting

D28 Inside Garden

D28 Outside Garden

# CONFIDENTIAL

| D29 Kitchen & Bath | Aisles clear of empty pallets, debris, and water. | RSW9D9 | N | N | carts with merch behind showroom on floor |
| | No leaning or protruding merchandise. | RSW9D9 | Y | | |
| | Merchandise restraints used per safety standards. | RSW9D9 | Y | | |
| | Palletized freight in overhead wrapped or banded to pallet. | RSW9D9 | Y | | |
| | Hand stacked merchandise in overhead stable and no higher than 4ft | RSW9D9 | Y | | |
| | All front beams bolted to uprights. | RSW9D9 | Y | | |
| | Flue spaces clear | RSW9D9 | Y | | |
| | Nothing hung from sprinklers and at least 18in between overhead sprinklers and storage below. | RSW9D9 | Y | | |
| | Fire extinguishers unblocked & mounted. | RSW9D9 | Y | | |

page 3   of 5

**HD0408**

Store Readiness Checklist Survey
Store: 6954:GROVE CITY
Survey Date: 6/3/2012

Approved: Yes
Approved By: KXG299
Approved Time: 9:13:45

| D29 Kitchen & Bath | No leaning or protruding merchandise. | TFH3122 | Y | Y | leaning merchandise in 29 put away product |
|---|---|---|---|---|---|
| | Merchandise restraints used per safety standards. | TFH3122 | Y | | |
| | Palletized freight in overhead wrapped or banded to pallet | TFH3122 | Y | | |
| | Hand stacked merchandise in overhead stable and no higher than 4ft. | TFH3122 | Y | | |
| | All front beams bolted to uprights. | TFH3122 | Y | | |
| | Flue spaces clear. | TFH3122 | Y | | |
| | Nothing hung from sprinklers and at least 18in between overhead sprinklers and storage below. | TFH3122 | Y | | |
| | Fire extinguishers unblocked & mounted. | TFH3122 | Y | | |
| | Extension cords/adaptors undamaged and not used for more than 24 hours continuously. | TFH3122 | Y | | |
| | Vanities are secured (cabinet thru-bolted to rack or fixture & sink top siliconed to cabinet) | TFH3122 | Y | | |

D30 Millwork

# CONFIDENTIAL

D42 Pro Desk / D78 TRC

D59 Decor

D90 Front End / Returns

page 4   of 5

# EXHIBIT B

Store Readiness Checklist Survey
Store: 6854-GROVE CITY
Survey Date: 5/26/2012

Approved: Yes
Approved By: JMN080
Approved Time: 9:54:38

| D29 Kitchen & Bath | Fire extinguishers unblocked & mounted. | RMT2172 | Y | | |
| | Expansion cords/adaptors undamaged and not used for more than 24 hours continuously | RMT2172 | Y | | |
| | Vanities are secured (cabinet thru-bolted to rack or fixture & sink top siliconed to cabinet) | RMT2172 | Y | | |
| D30 Millwork | | | | | |
| D42 Pro Desk / D78 TRC | | | | | |
| D59 Decor | | | | | |
| D90 Front End / Returns | | | | | |

**CONFIDENTIAL**

page 4   of 5

HD0034

# EXHIBIT C

# Lane
# Alton
# Horst LLC
Attorneys at Law

TWO MIRANOVA PLACE
SUITE 500
COLUMBUS, OH 43215

TELE: 614-228-6885
FAX: 614-228-0146
www.lanealton.com

WRITER'S DIRECT DIAL:
614-233-4731

Email: EHubbard@lanealton.com

COLLIS GUNDY LANE (1904-1987)
THEODORE L. HORST (1908-2000)
JACK R. ALTON (1925-2011))

MARY BARLEY-McBRIDE
JAMES H. BOWNAS
MARY McWILLIAMS DENGLER
SCOTT A. FENTON
JENIFER A. FRENCH
CURTIS F. GANTZ
JOSEPH A. GERLING
CHAD K. HEMMINGER

EDWARD G. HUBBARD
JEFFREY W. HUTSON
THOMAS J. KEENER
MICHAEL J. KELLEY
RICK E. MARSH
TIMOTHY J. OWENS
RAY S. PANTLE
CHRIS O. PAPARODIS
CHRISTOPHER R. PETTIT
GREGORY D. RANKIN

DOUGLAS J. SCHOCKMAN
CLAUDIA L. SPRIGGS
THOMAS E. SWITZER
MONICA L. WALLER
TODD A. WEBER
STEPHEN B. YURIK

COUNSEL TO THE FIRM
DAVID G. COX
JAMES W. LEWIS
ALAN WAYNE SHEPPARD

July 9, 2013

James K. Hunter, III, Esq.
Hunter Law Office
673 Mohawk Street, Suite 400
Columbus, Ohio  43206

Michael J. Rourke, Esq.
Rourke & Blumenthal, LLP
495 S. High Street, Ste. 450
Columbus, Ohio  43215

Re:     *Joan Lee Ross, et al. v Home Depot, U.S.A., Inc., et al.*
        U.S. District Court, S.D. of Ohio, Eastern Div. Case No. 2:12-cv-0743

**Via E-Mail**

**CONFIDENTIAL**

Dear Counsel:

We have reviewed your letter of June 12, 2013 regarding Plaintiffs' Second Request for Production of Documents.  In response, Home Depot, U.S.A., Inc. ("Home Depot") is supplementing its prior responses to the Second Request as follows:

Request 1:  Without waiving its prior objections, and in the spirit of cooperation and good faith, Home Depot is attaching additional Store Readiness Checklists for the following dates: 4/9/2012-5/30/2012, 6/26/2012, as HD0185-HD0450.  Consistent with the last production, the portions of the Checklists for the departments other than the department where the incident occurred are redacted, as they are not relevant.  Home Depot will prepare a privilege log with respect to the redacted Store Readiness Checklists and file the same under seal with the Court.

Request 2:  As you are aware, evidence of prior incidents is not admissible unless the incidents are substantially similar to the subject incident.  This incident involves a trip and fall over an extension cord taped to the floor.  As such, incidents involving customers who allege they slipped on water or tripped in the parking lot, for example, are not even remotely similar to the subject incident.  Once again, however, Home Depot is willing to resolve this dispute by agreeing to identify those incidents in which a customer alleged they slipped, tripped, or fell at the Grove City Home Depot Store

Confidential                           Page 2                           7/9/2013

between June 26, 2012 and July 1, 2012 even though none of these incidents bear any factual resemblance to the incident at issue. Without waiving its prior objections, Home Depot supplements its prior response by providing the following information which is produced pursuant to the protective order and is to remain confidential:

| Date | Store | Customer Name | Description |
|------|-------|---------------|-------------|
| 6/26/12 | 6954 | ROSS, JOAN L | Customer was looking at fans in the front bulk area. She stepped on a taped down cord for one of the displays and fell backwards. She twisted her left knee and fell on her left shoulder. She was transported by ambulance. |
| 4/12/12 | 6954 | Redacted | Customer was walking down the main aisle by flooring, lost his balance, fell backward hitting his head on the floor. He sustained a surface laceration on the back of his head. |
| 3/9/12 | 6954 | Redacted | Customer was exiting the door when the wind pushed her down and she fell on her head and hit her elbow as well. Leaving a scrape on both areas. |
| 8/22/11 | 6954 | Redacted | Customer tripped in the parking lot and fell on her face. |
| 8/6/11 | 6954 | Redacted | Customer claimed she slipped on a water spot on the floor and hurting her ankle |
| 6/1/11 | 6954 | Redacted | Customer exiting building through contractor entrance walked over pro parking space where truck previously parked there has leaked oil, and slipped on the puddle. She fell awkwardly, and landed on her right knee resulting in a bruise just below patella. |
| 6/20/10 | 6954 | Redacted | small child doing cartwheel in store, fell and hit her head above left eye, blood came out of left nose hole |

Request 3: Home Depot provided portions of its Asset Protection Guide pertaining to slips, trips, and falls. Home Depot supplements its production by providing HD0451. Home Depot stands by its objections as to the remaining portions of the Asset Protection Guide which contain policies that have no relevance to this matter and which are not reasonably calculated to lead to the discovery of admissible evidence. Portions of the Asset Protection Guide that will not be produced pertain to employee back injury prevention program, use of lift equipment, store markdowns and inventory, fire protection, receiving dock safety, and handling hazardous materials, just to name a few examples. If Plaintiffs can explain how these portions of the guide are discoverable and relevant to this case, Home Depot will reconsider its position, until such time, however, Home Depot will prepare a privilege log as to the remaining pages of the Asset Protection Guide and file the same under seal with the Court.

Request 4: Home Depot stated that it does not have a "Home Depot Associate Handbook." Rather than simply standing on its objections, Home Depot's response explained that Home Depot does have policies which are discoverable in this case, and those are the policies in effect on the date of the loss pertaining to the use of extension

Confidential                              Page 3                              7/9/2013

cords for displays and slip/trip/fall hazards, and that those policies were being produced. Plaintiffs contend that because of the protective order, there is no such thing as an objectionable policy. Plaintiffs are mistaken. The protective order governs the confidentiality of discoverable documents, it does not nullify Ohio law on discovery nor does it render every policy, irrespective of the subject matter, discoverable. Home Depot is the largest home improvement retailer, and has hundreds of thousands of employees. As such it has a plethora of policies which have nothing to do with this lawsuit. Examples of objectionable policies that are not discoverable are set forth above with respect to Request No. 3. Others include policies related to the use of cash registers, the receiving department, the vault, renting the load n' go trucks, special orders, lift truck use and operation, employee dress code, handling Christmas trees, and employee attendance, just to name a few.

Home Depot has been more than forthcoming in providing responsive, discoverable documents in this case. If Plaintiffs can identify other subject areas in addition to the use of extension cords for displays and policies regarding slip/trip/fall hazards which they consider discoverable, we will be more than happy to consider that request.

We remain open to discuss any further concerns you may have in order to avoid the need for Court intervention, but would suggest deferring such discussions until such time that the Plaintiffs have the privilege logs in hand.


                              Very truly yours,

                              **LANE, ALTON & HORST LLC**

                              /s/ Edward G. Hubbard

                              Edward G. Hubbard

Enclosures

# DEPOSITION PAGES REFERENCED

## (Transcripts filed.)

# HANSBERRY

## Pages 40,70, 71, 103, 106

1     A.        You could reference it online

2    electronically.

3    **Q.**       **Okay.**

4    A.        Or there was -- these hard copies were

5    given out to various associates and kept in a

6    centralized location.

7    **Q.**       **Okay.  What I want to do -- I want to**

8    **walk through some portions of this.  If you turn**

9    **-- there's page numbers that have been stamped HD.**

10   **Do you see that.  I want you to go to HD1023.**

11   A.       Okay.

12   **Q.**       **1023.  All right.  And would you agree**

13   **that at Home Depot, it was important to maintain a**

14   **safe and profitable work and shopping environment**

15   **for, among others, customers?**

16   A.       Yes.

17   **Q.**       **That was deemed to be something that**

18   **all the associates should be involved in?**

19   A.       Yes.

20   **Q.**       **The last sentence of that first**

21   **paragraph says, "All associates are required to**

22   **immediately address issues and report unsafe**

23   **conditions or behaviors to their manager."  Was**

24   **that something that was a guideline or a rule at**

1    "Use extension cords for temporary use only up to

2    24 hours."  So you would agree with me that this

3    policy applies to Department 29 as well as other

4    departments?

5    A.        Yes.

6    Q.        We looked earlier -- one of the first

7    things we read as far as associate responsibility

8    was that associates should ensure that the

9    department aisles and walking surfaces are safe.

10   Do you agree with that?  Was that one of the

11   obligations of associates?

12   A.        Yes.

13   Q.        Do you feel running a cord across an

14   aisle to the fan display is a safe -- is a safe

15   way to display merchandise?

16             MR. GERLING:  Objection.  You may

17   answer.

18   A.        I can't say yes or no.  I -- in my

19   experience, has it been successful in the past?

20   Yes.

21   Q.        Okay.  Tell me about your experience in

22   stringing extension cords across aisles.

23   A.        For previous companies, I have strung

24   an extension cord across an aisle.

1    Q.       Okay.

2    A.       In a similar fashion.

3    Q.       In what -- for what companies?

4    A.       Pep Boys.

5    Q.       All right.  And what was the purpose of

6    doing that?

7    A.       Light a display.

8    Q.       Pardon me?

9    A.       To light a display.

10    Q.       All right.  And how was it affixed to

11    the floor?

12    A.       Duct tape.

13    Q.       All right.  And did you -- take a look

14    at Exhibit 1, and particularly page 17, 0017.

15    Would you agree with me that -- first of all, did

16    you see -- do you recall that the cord itself was

17    orange?

18    A.       Yes.

19    Q.       Okay.  Would you agree with me that

20    using gray tape on a gray floor makes it harder to

21    see the cord?

22    A.       No.  For me?  No.

23    Q.       All right.  Were other colors available

24    at Home Depot of duct tape?

1    **fan display.  What should they do as far as this**

2    **checklist?**

3    A.          It depends.  So typically, if it was

4    something that they were able to fix, they would

5    fix it, which might be a possibility of why

6    there's a "Y."  So just because there's a "Y"

7    there doesn't mean that there necessarily was an

8    empty pallet there, but it might have been an

9    issue that was fixed immediately.

10   **Q.          Okay.**

11   A.          Or able to fix immediately.  Some

12   associates will still -- even if the issue is able

13   to be fixed immediately, they will still notate it

14   on the checklist either for -- just the record

15   because it makes them feel more comfortable or

16   because it's an issue they might not be able fix

17   immediately.

18   **Q.          Okay.  And for an example, one of the**

19   **other categories is, "Palletize freight and**

20   **overhead wrapped or banded to pallet."  And the**

21   **associate -- and is it your understanding that the**

22   **initials that we see there are the associate's**

23   **initials?**

24   A.          Yes.

1    A.        Correct.

2    Q.        Okay.  So in other words, at least the

3    expected practice for Home Depot was that every

4    day that this display was up, somebody should be

5    walking the aisles around the fan, looking for

6    trip hazards?

7    A.        Yes.  Perceived trip hazards.

8    Q.        All right.  And if -- well, first of

9    all, if you look at D27 and then next page, D28

10    and D29, would you agree with me that for all of

11    those, for the category of "aisles clear," it's

12    marked yes.  So in other words, nobody perceived a

13    problem any time -- on that day in any of the

14    aisles for any of those departments?

15    A.        For "aisles clear," yes.

16    Q.        Okay.  Unless they corrected it

17    immediately, as you said?

18    A.        Correct.

19    Q.        Sometimes they would still put "yes"

20    because they picked up the hammer and put it on

21    the shelf and didn't bother, then, putting in all

22    the information?

23    A.        Right.

24    Q.        Okay.  And I'm not going to have you

BENDOFF

Pages 24, 73, 76

24

1  Q.          Was it you?

2  A.          No.

3  Q.          All right.

4  A.          It's -- beings that this is the air

5  conditioning and fan, seasonal lay-down would

6  probably be kitchen and bath, but I don't know 100

7  percent for sure who did it that day.

8  Q.          Okay.  But this would not be an area

9  that you would typically walk on a daily basis or

10 some associate from your department back at that

11 time would walk on a daily basis to prepare a

12 daily store readiness checklist report?

13 A.          No.

14 Q.          Would you agree with me from your

15 position as an InFocus team leader and then a

16 supervisor at Home Depot that customer safety

17 should always be a primarily consideration?

18 A.          100 percent.

19 Q.          It certainly should be a primary

20 consideration in any decision concerning

21 merchandise display?

22 A.          That's correct.

23 Q.          Would you agree that Home Depot should

24 always do its best to reduce the risk of customer

73

1    A.         I do.

2    Q.         Did it ever occur to you that this

3    could be something that a customer could fall on?

4    A.         We felt we had that -- that it was

5    secured.

6    Q.         And when you say, "we," who's "we"?

7    A.         I didn't personally install the tape,

8    but we felt that it was overall secured.

9    Q.         And when you say, "we," was there a

10   discussion about it before Mrs. Ross's injury?

11   A.         No.

12   Q.         All right.  Well, then when you say,

13   "we felt" it was secure, what do you mean?

14   A.         That it would -- that it was okay for

15   safety standards; that it was secured to the floor

16   much in the manner that we had cords secured to

17   the floor in the past where we would have to run

18   electric to a computer or something like that.  We

19   felt that taping it to the floor securely was

20   okay.

21   Q.         And -- and you've said "we" several

22   times.  I want to know, is there anybody else in

23   this "we" other than yourself?

24   A.         I guess management.

76

1    Q.          Okay.   That was at least one

2    explanation --

3    A.          Yes.

4    Q.          -- that she must be in shock because,

5    if she wasn't, she'd be acting a lot differently.

6    A.          Correct.

7    Q.          Okay.   Do you recall any of the EMTs

8    remarking that they tripped over the cord or

9    stumbled over the cord?

10   A.          No.

11   Q.          Do you recall being told by anybody

12   that there had been prior people -- prior

13   occasions where people had caught their foot on

14   that tape or that cord?

15   A.          No.

16   Q.          Okay.   Did you talk to Lisa Young about

17   going back through the video to see if it showed

18   other people tripping on that tape?

19   A.          No.

20   Q.          Do you have any knowledge about how

21   long video is maintained on the system?

22   A.          I don't.

23   Q.          Okay.   In other words, have you ever

24   had experience -- strike that.

# KELLEY

## Pages 27, 33

1   Q.        You mentioned that you -- it was part

2   of the safety training, training on what the

3   expectations were regarding aisleways.  What are

4   those expectations?

5   A.        Keep them clear and uncluttered.

6   Q.        Was it explained that that's both for

7   aesthetics and for safety reasons?

8   A.        Yes.

9   Q.        At Home Depot, is customer safety one

10  of the top concerns?

11  A.        It is.

12  Q.        Would you agree with me that customer

13  safety should always be a top consideration when

14  deciding how to display merchandise?

15  A.        Yes.

16  Q.        Would you agree that Home Depot should

17  do its best to reduce the risks for customers?

18  A.        And associates, yes.

19  Q.        And associates.  Absolutely.

20            Would you agree with me that, really

21  any risk for a customer is unreasonable if there

22  are economic and feasible ways to eliminate that

23  risk?

24            MR. GERLING:  Objection.  You may

33

1   A.          Oh, yes.

2   Q.          The last sentence of that first block

3   there says, "All associates are required to

4   immediately address issues and report unsafe

5   conditions or behaviors to their manager."

6              Is that something you understand is a

7   responsibility of the associates at Home Depot?

8   A.          Yes.

9   Q.          Do you -- well, strike that.

10             First of all, yourself, did you ever

11  report the cord that we see in Exhibit 1 to a

12  manager or anybody else as an unsafe condition?

13  A.          I did not.

14  Q.          Do you know if anybody else did?

15  A.          I do not have knowledge of that.

16  Q.          Do you know if any customers ever

17  complained about the location of that cord across

18  the aisleway?

19  A.          I have no knowledge of that.

20  Q.          Is there a formal complaint system at

21  Home Depot, say a customer comes up with a

22  complaint about a condition or an unsafe practice,

23  things of that nature?

24  A.          There's not a formal system.  If

# MANSFIELD

## Pages 33, 34, 38

33

1    cord much more observable than using gray duct

2    tape on a gray floor?

3    A.          I can see how it would be more

4    observable.  I see that there.  I see it with the

5    reflection there, I can see that tape.  But I --

6    orange could make it more visible.

7    Q.          All right.  Do you agree that anything

8    that's laid across the floor can create a trip

9    hazard for customers or employees?

10   A.          I don't agree that it could be --

11   something not laid with care could create a trip

12   hazard for customers, but I agree that there's

13   ways to do it so that it's not a trip hazard for

14   customers.

15   Q.          And in regard to what we see in

16   Exhibit 1, was this ever, to your knowledge,

17   brought to your attention by anybody doing either

18   daily inspections or anything else as being a

19   potential trip hazard?

20   A.          Not to my knowledge.

21   Q.          And as you sit here today, do you have

22   any recollection of anybody, not just Shannon

23   Maxwell, bringing this cord to your attention and

24   telling you that it should be taken care of or

34

1      something should be done about it?

2      A.          No, not to my knowledge.

3      Q.          As a former assistant manager at Home

4      Depot, would you agree that at Home Depot customer

5      safety should always be the primary consideration?

6      A.          Yes.

7      Q.          Especially concerning merchandise

8      display?

9      A.          Yes.

10     Q.          Would you agree that Home Depot should

11     do its best to reduce the risk of customer injury?

12     A.          Yes.

13     Q.          Would you agree that all of the

14     associates at Home Depot should be on the lookout

15     for conditions that could harm customers?

16     A.          Yes.

17     Q.          And do you agree that Home Depot should

18     always display its merchandise so that customers

19     can inspect or look at the merchandise safely?

20     A.          Yes.

21     Q.          Would you agree that Home Depot has a

22     responsibility to provide safe aisles and

23     aisleways for the customers and its own employees?

24     A.          Yes.

38

1    don't do anything with it?

2    A.       Uh-huh.

3    Q.       Is that a yes?

4    A.       That is yes.  Sorry.

5    Q.       All right.  Do you know who directed

6    that it be taken up off the floor?

7    A.       No, I do not.

8    Q.       Was it taken up off the floor because

9    it was now recognized as a potential hazard?

10    A.       I can't speak to that.  I'm not sure

11    why it was removed.

12    Q.       Would you agree with me that the cord

13    did pose a potential hazard, a trip hazard to

14    customers?

15    A.       I didn't feel that it did prior to

16    that.  But if the customer fell over it at that

17    point in time, I guess it does create a trip

18    hazard for the customer.  But I wouldn't think it

19    did that prior to that.

20    Q.       Well, let me ask you:  We went through

21    this.  As you sit here today, you don't even

22    recall being aware of this cord, correct?  Until

23    after the incident occurred?

24    A.       Don't recall, no.

# MAXWELL

## Pages 24, 25, 50, 60, 63. 64, 67, 83, 91

24

1    A.          No.

2    Q.          That was a smaller display?

3    A.          It was a very small display.

4    Q.          Okay.  For your training, first of all

5    as a MEM, did you receive any training about

6    safety issues?

7    A.          Always.

8    Q.          Okay.  Did you receive any specific

9    training of Home Depot's practices in regard to

10   energizing displays?

11   A.          Yes, sir.

12   Q.          Tell me about that.

13   A.          We typically don't power anything up.

14   We don't power anything up on the MET team unless

15   it's in the instructions to do so.  So we will do,

16   for example, Christmas would be one that was big

17   with lighting.

18   Q.          Sure.

19   A.          There was specifics about what we could

20   do so, you know, months before I would have to

21   make sure the electric lines that were kind of in

22   the retractables, they were functional so that we

23   could drop them down and use these for our

24   displays.  We could not use extension cords

1    because of fire marshall reasons was the main

2    concern.  We were around, you know, the fluffy

3    white stuff that you -- like the artificial snow,

4    so, you know, having an electrical cord in there

5    would be a fire hazard.

6    Q.          Okay.  You have in front of you here a

7    notebook that has a number of exhibits and it's

8    tabbed same thing as I'm looking at.

9    A.          Okay.

10   Q.          And if you would, turn to Exhibit 9.

11   First of all, does this appear to be a patio

12   display?

13   A.          It is.

14   Q.          All right.  And I'll just tell you that

15   this is a patio display at the Grove City Home

16   Depot store.

17   A.          Okay.

18   Q.          Suspended above the patio furniture

19   there are -- those are two outlets?

20   A.          Correct.

21   Q.          And you said that one of the things you

22   would do for the Christmas display is well in

23   advance you would make sure that those were

24   functional?

50

1  likely, we screwed it down.  So as we dismantle

2  that, all those things would be disposed of.

3  Q.          Okay.  Did anybody from Asset

4  Protection ever talk to you about this incident

5  and what information would be available about the

6  display?

7  A.          No.

8  Q.          Did anybody from Asset Protection talk

9  to you about preserving information about the

10  display?

11  A.          No.

12  Q.          Turn to Exhibit 6 if you would.  Tell

13  me what Exhibit 6 is.

14  A.          This is a project summary for the MET

15  team.

16  Q.          Okay.  And this specifically is for the

17  AC fan seasonal set?

18  A.          Correct.

19  Q.          And in looking at the execution

20  timeline, this would be for the spring of 2012?

21  A.          Yes.

22  Q.          And it indicates a timeline of April 9,

23  2012 through April 20, 2012, two-week execution.

24  Tell me what that means.

60

1  Depot is reimbursed by G.E. for these minutes

2  spent by the MET team?

3  A.          That's how they would determine how

4  much MET was going to get paid, yes.

5  Q.          Okay.  Now, would you agree with me

6  that if a display is to be energized, you're

7  trained that it is to be done from the overhead

8  drop downs if it's in the seasonal displays?

9  A.          Sometimes it's on power equipment on

10  the -- or the plugs on the wall, but, yeah, I

11  mean, I get extreme details about how I'm supposed

12  to energize the Christmas.  Like if you were to

13  pull the Christmas one, it would be huge.

14  Q.          Okay.  Now, are you -- is it standard

15  that you are told that extension cords are not to

16  be used?

17  A.          We don't use extension cords because of

18  fire marshall reasons.  I mean, we worry about the

19  heat that produces on an extension cord and the

20  fact that it doesn't shut down when there's a

21  surge.

22  Q.          Okay.  So is it fair to say that at

23  least from the MET team perspective, extension

24  cords are not to be used?

1  that they were using the proper outlet.  We can't

2  have things running longer than, you know, the

3  operating hours, so if it's plugged in for

4  24 hours continuously, it's a fire hazard.

5  Q.       All right.  Well, aside from that, when

6  you say plugged in or energized properly, what --

7  for a display like the fan display, what would be

8  the proper way to energize it if you were going to

9  do it?

10  A.       To find on outlet that didn't run 24/47

11  and I would -- I mean, I -- I would make sure that

12  I had the proper outlet.

13  Q.       All right.

14  A.       You know?

15  Q.       And would you agree that me that the

16  proper outlet for seasonal displays like this that

17  are away from the wall are the overhead outlets?

18  A.       If you can get them to stretch over

19  there, yes.

20  Q.       But if you can't, is the -- your option

21  is to not energize it, wouldn't you agree with

22  that?

23  A.       They could use a power strip and still

24  energize it across the floor so long as it was on

64

1  a power strip.

2  Q.        All right.  So you say that you --

3  well, strike that.

4           Take a look at Exhibit 1.  I'm going to

5  tell you that this is a photograph taken by a Home

6  Depot employee of the cord going to the fan

7  display at the Grove City store.

8  A.        Uh-huh.

9  Q.        First of all, did you ever see this?

10 A.        I did.

11 Q.        When did you see it?

12 A.        Shortly after I had set it.

13 Q.        All right.  Did your team do this?

14 A.        No.

15 Q.        When was it, then, that you saw it?

16 A.        I saw it when we came back into the

17 store.  We -- being the MET team and outsiders was

18 common practice for us to kind of walk through the

19 things that -- major resets that we've done to

20 make sure that it wasn't altered.  And it was

21 brought to my attention that there was a working

22 display.

23 Q.        Okay.  So it was brought to your

24 attention that somebody at the store had altered

67

1  smaller ones.

2  Q.          All right.  Was the cord that we see in

3  Exhibit 1 taped with gray tape as we see it here?

4  A.          Yes.

5  Q.          Would you agree with me that using

6  silver tape on a gray floor makes it more

7  difficult to see then if it was an orange cord?

8  A.          Orange would be more visible.

9  Q.          All right.

10  A.          But it was apparent to me that it was

11  there because I was not happy about it from an

12  aesthetic standpoint.

13  Q.          All right.  You didn't like the look of

14  it?

15  A.          I didn't.

16  Q.          Did you think about the fact that it

17  could be a trip hazard?

18  A.          No.

19  Q.          All right.  It was a -- using an

20  extension cord to energize the fan display,

21  correct?

22  A.          It was.

23  Q.          There's no GFI on it, is there?

24  A.          Nope.

1    like it?

2    A.          I didn't -- yeah, I didn't like it.

3    Q.          Okay.  Now, if you felt that it was

4    something that for safety reasons you wanted it

5    out, did you have the ability to go to the store

6    manager and say, hey, this is a hazard, this

7    should be taken up?

8    A.          I was a partner, so, yes.

9    Q.          Okay.  If you look at page 3 of

10   Exhibit 6, the upper right picture, this is of I

11   think an air-conditioning unit, but it says,

12   extension cords neatly wrapped on all.  I'm sure

13   that's, number one, from an aesthetics purpose,

14   but would you agree it's also not a good idea to

15   have extension cords looped out on to aisleways,

16   things of that nature, because they can be a trip

17   hazard?

18   A.          We would neatly coil them from --

19   because we wanted the display to look neat, but

20   sometimes we even used it to mount the unit down.

21   Like I would loop a zip tie through that to make

22   sure that that along with the wheels it was secure

23   to the platform.

24   Q.          Okay.  Would you agree with me, though,

1   Q.      Okay.

2   A.      Like we started out with just doing

3   lawn and garden.  And then as more merchants got

4   the buy-in from the vendors, the more

5   responsibility we picked up.

6   Q.      All right.  And so it sounds like the

7   whole MET concept was evolving --

8   A.      Correct.

9   Q.      -- while you were working there?

10   A.      Correct.

11   Q.      Okay.  Would you agree that customer

12   safety should always be the primary consideration

13   in any decision concerning merchandise display?

14   A.      Customer and associate safety is -- is

15   always the first thing that we go to.

16   Q.      Would you agree that Home Depot should

17   always do its best to reduce the risk of customer

18   injury?

19   A.      We -- we strive for that, yes.

20   Q.      Would you agree that any risk of

21   customer injury is unreasonable if there's a

22   feasible way to eliminate or reduce the risk?

23   A.      You'll have to re-word that.

24   Q.      Sure.  Would you agree that if you have

# WIGHTMAN

## Pages 43, 55, 56, 57, 32

43

1    A.         Okay.  Yes, sir.  I'm sorry.

2    Q.         Then the last bullet point says, For

3    store built displays extension cords must not be

4    used as permanent wiring.  In parenthesis it says,

5    Longer than 24 hours.  Once again, would you agree

6    with me that that is a policy that applies to Home

7    Depot stores including the Grove City store?

8    A.         Yes, sir.

9    Q.         And is it your understanding that that

10   policy is for safety purposes?

11   A.         That's to keep the cord from

12   overheating.  Yes, sir.

13   Q.         If you turn to page 1106, this is

14   displays again.  This is for -- first bullet point

15   says, Plug electrical fixtures, i.e. ponds,

16   fountains directly into a hardwired GFCI outlet,

17   no extension cords.

18              Once again, that is a policy for Home

19   Depot?

20   A.         Yes, sir.

21   Q.         The overhead electrical outlets at Home

22   Depot at the Grove City store, were they GFCI

23   outlets, or do you know?

24   A.         The ones in the garden center, but the

55

1   Q.        Sure.  Would you agree with me that if

2   the MET team had wanted to or if you and your

3   manager when you walked it out, said let's put the

4   fan display below these electrical cords that we

5   see here, that could be done?

6   A.        Yes, sir.

7   Q.        In other words, there's nothing

8   physically that would prevent that from being done

9   in that location?

10   A.        I agree.

11   Q.        And the main reason for not putting it

12   there and putting it where it was put, the fan

13   display, was for merchandising purposes -- for

14   sales purposes?

15   A.        Yes, sir.

16   Q.        Do you feel that putting the extension

17   cord across the aisle was the safest way to

18   energize the fan display?

19   A.        No, sir.

20   Q.        You -- you would agree with me that

21   there was a safer alternative that wouldn't create

22   a trip hazard?

23   A.        In hindsight, yes, sir.

24   Q.        Did -- were you aware of the extension

56

1   cord being across the aisle prior to this

2   incident?

3   A.       I would assume, yes, sir.  I -- I

4   really honestly don't remember it until she

5   tripped over it.

6   Q.       All right.  You would agree with me

7   that it -- because of the similarity in color

8   between the tape and the concrete floor, that the

9   cord is not readily visible or easily visible for

10   a person shopping?

11          MR. GERLING:  Objection, go ahead.

12   A.       I mean, it's gray and gray.  I mean,

13   I'm color blind, so it wouldn't be that easy for

14   me to see.

15   Q.       All right.  And would you agree with me

16   that the fan display as we see in Exhibit 7, that

17   the whole purpose of that fan display was to

18   attract attention and -- in the hopes that people

19   would look at the fans, inspect the fans, walk

20   around the display and look at the various fans

21   that are on display?

22   A.       Yes, sir.

23   Q.       So it was anticipated that people would

24   be looking at those fans while they walked around

57

1    this display, would you agree with that?

2    A.          Yes, sir.

3    Q.          To your knowledge, did any associate

4    ever report the extension cord to you or anybody

5    else as a potential safety hazard?

6    A.          No, sir.

7    Q.          Did you ever go back and look at the

8    store readiness checklist to see if anyone had

9    ever documented the cord as being a safety problem

10   in need of correction?

11   A.          No, sir.

12              (Plaintiffs' Deposition Exhibit 17 was

13   marked for identification and retained by

14   plaintiffs' counsel.)

15   BY MR. ROURKE:

16   Q.          I'm showing you what I've marked as

17   Exhibit 17.  Can you identify what you are looking

18   at?

19   A.          That is a copy of the store readiness

20   checklist.

21   Q.          All right.  And obviously this is a

22   printout; you usually see it on a screen, I take

23   it?

24   A.          Yes, sir.

32

1   unprofitable conditions immediately or notify

2   manager on duty.  I think that dovetails with what

3   we talked before, but you would agree that that is

4   a policy and procedure at Home Depot?

5   A.          Yes, sir.

6   Q.          If you go to the next page 10 -- 1025.

7   A.          Yes, sir.

8   Q.          Very first bullet point, would you

9   agree that safety is the number one priority while

10  shopping and working in the stores?

11  A.          Yes, sir.

12  Q.          If you go to the next column, it's got

13  a title called the InFocus team.  What is that?

14  A.          InFocus team is a member of an assoc --

15  is a -- is a group of associates that the store

16  manager, operation's manager picks from different

17  departments throughout the store or different,

18  like receiving, front end, one of the departments.

19  Just a -- just a group of associates that actually

20  walk a -- they are part of the safety crew is what

21  we call them.  They -- they're out there looking

22  for safety issues throughout the store.

23  Q.          And how often do they do that, do they

24  perform those tasks?

# JOAN ROSS

## Pages 38, 40, 41, 42, 49, 50, 53, 56, 58, 61, 62

38

1    head when you fell, but you don't think so?

2    A.        No, I don't think so.

3    Q.        Okay.  I know you've had some surgeries

4    and quite a bit of rehab.  How does your knee feel

5    now?

6    A.        It -- like just sitting here, it's

7    fine.  But walking, it still gets extremely sore

8    if I have to, you know, walk any distance at all

9    and -- when they set my leg, my leg's crooked and

10   it -- it bothers me a lot down in my shin, it

11   hurts a lot there and my foot swells.

12   Q.        Your left foot swells if you walk and

13   use it?

14   A.        Uh-huh.

15             MR. ROURKE:  Is that a yes?  I'm -- is

16   that a yes?

17   A.        Yes.  I'm sorry.

18             MR. ROURKE:  That's okay.

19   Q.        That's okay.

20             MR. ROURKE:  No problem.

21   Q.        I didn't go over that one with you, but

22   you've been doing so well.  You have to answer

23   verbally.

24             Okay.  Any other present difficulties

1   A.          Yes.  If I -- a lot more difficult

2   level, I'd have a lot more pain.  Less activity

3   level, less pain.

4   Q.          Are you currently using a walker or a

5   cane?

6   A.          A cane.

7   Q.          Okay.  And do you use that pretty much

8   all the time you walk?

9   A.          I use it at home in the house.  I use

10  it mainly for going upstairs and downstairs, and

11  of course getting up in the morning because it's

12  very difficult.  And I use it in the house at

13  night a lot of times if my leg's really bothering

14  me.  And I generally use it all the time outside.

15  I may walk in the garage or something without it

16  or like around -- out our garage to look at our

17  flowers or something without it.  But if I go

18  anywhere, I always have my cane with me.

19  Q.          And presently what do you do for

20  recreation?

21  A.          Not a whole lot.  There's not a lot

22  that I can do.  A lot of the things that I enjoyed

23  doing, I can't do anymore.  I loved to garden,

24  it's very -- I can't get down to -- to do anything

41

1    like that.  I like to -- we have a pool, but it's

2    difficult to get in and out of now.  And when I

3    get in the pool, I like to pull my hair back, and

4    I can't pull my hair back because of my arm, so...

5    Q.         Can you think of -- well, do you still

6    get in the pool, does that seem to help your leg

7    at all if you can get in there and get going?

8    A.         It does help.

9    Q.         Okay.

10   A.         I can actually walk around in the pool

11   and feel like I'm normal again.

12   Q.         Uh-huh.

13              Any other difficulties you can think of

14   with your leg and knee?  And I'm just trying to

15   get a good picture of it.  I understand there's

16   probably more.

17   A.         I can't think of anything right now.

18   But I'm sure there probably are other things too.

19   Q.         But we've touched most of the main

20   things?

21   A.         Yes.

22   Q.         How about your shoulder, how does that

23   feel now?

24   A.         Well, it's -- that's as far as it will

42

1    go.

2    Q.        Okay.  You're lifting your arm away

3    from your side and it's --

4    A.        Yes.

5    Q.        It's not very far away from your side?

6    A.        Okay.  Like this.

7    Q.        Okay.

8    A.        And this is as far as I can go out.

9    Q.        And you can't raise your arm above your

10   head?

11   A.        No.  This is -- I have to go like this

12   to touch my face.

13   Q.        Do you have pain in your shoulder

14   still?

15   A.        I don't have any -- I haven't -- I

16   never did have pain in my shoulder.  All the pain

17   has been in my -- what is that, your forearm.

18   Q.        Upper arm?

19   A.        Upper arm.  And like now, no.  But

20   doing this, yes, it hurts.

21   Q.        So you have some pain when you try to

22   raise your arm?

23   A.        Yes.

24   Q.        You have pain in your upper arm?

49

1    Q.          Has he given you any treatment related

2    to any consequences of the fall?

3    A.          No.  I've not been to him.

4    Q.          Okay.  Are you currently getting any

5    physical therapy?

6    A.          No.

7    Q.          When was your last bout with that?

8    A.          In June of this year.

9    Q.          Other than the bone density medicine,

10   are you taking any other medications for anything

11   having to do with your injuries?

12   A.          The only thing that I take, I've been

13   taking, is an Aleve.

14   Q.          Okay.

15   A.          Once in the morning.

16   Q.          Just over-the-counter stuff?

17   A.          Yes.

18   Q.          Okay.

19   A.          I'm on no other medications.

20   Q.          In terms of scarring from your -- from

21   the surgeries, do you have some scarring on your

22   shoulder?

23   A.          I have some, but it's not -- it's not

24   bad.  He did a phenomenal job.

1    Q.         How about on your leg, your knee?

2    A.         I have one cross --

3    Q.         Just --

4    A.         I don't know.  Do you want to see it?

5    You can see it.

6    Q.         Yeah, if you -- I'll just take a quick

7    peek.

8    A.         It's not that bad.  There and then

9    there.

10    Q.         Mostly running from your lower leg up

11    to the bottom of your knee?

12    A.         Yes.

13    Q.         Okay.  Thank you.

14              So Dr. Fowler was your primary doctor

15    and he was at Mount Carmel West?

16    A.         Yes.

17    Q.         Okay.  I saw reference in the medical

18    records to a Dr. Michael Alexander.  Do you

19    remember that name?

20    A.         No.

21    Q.         And it could be somebody that just saw

22    you briefly in the hospital and his name got in

23    there, so -- but you don't recall going to Dr.

24    Alexander?

1   Q.          Okay.  Where did you get physical

2   therapy when you finally started taking it?  Or

3   did you?

4   A.          Well, I had -- oh, you mean after the

5   home therapy?

6   Q.          Yes.

7   A.          I went to OhioHealth.

8   Q.          Okay.  And that was generally when?

9   A.          February I started there, I think in

10  late February.

11  Q.          Of this year?

12  A.          Uh-huh.

13  Q.          And tell --

14  A.          It ended in June.

15  Q.          Okay.  And tell me what you did there.

16  A.          Did a lot there.  A lot of exercises.

17  The bike, the elliptical.  Different things they

18  were trying to do for my arm like a ladder,

19  climbing ladder.  I had the try to climb a ladder.

20  Q.          Yeah.

21  A.          Different -- really a lot of stretches,

22  stretching my leg.  The -- use the rubber.

23  Q.          Bands?

24  A.          Bands, yes.  A lot of stuff with those.

1    and just put up with it.  And then I was told --

2    told my therapist about it, and she is the one --

3    she said I need to call my doctor immediately and

4    let them know.

5    Q.       This was somebody from Arlingworth?

6    A.       Yes.

7    Q.       Okay.

8    A.       So I did.  I called Dr. Fowler, and he

9    got me in the next day.  And they x-rayed my leg

10    and he said he really couldn't see anything so he

11    wanted me to have an MRI.  So they scheduled an

12    MRI for me, which was a couple days later, and he

13    wanted me to -- at that point I was starting to

14    use the cane, my cane.  And he wanted me to go

15    back to the walker and walk as little as possible,

16    try not to put any weight on my left leg.  And

17    then they -- I had the MRI done, and I -- he

18    thought that it was a -- would be a stress

19    fracture but what he told me was he didn't see an

20    actual stress fracture but he wanted to treat it

21    like a stress fracture.

22    Q.       Uh-huh.

23    A.       And then I -- he put me back on the

24    walker, and I had -- I used that for another 10

58

1   that since this incident happened?

2   A.          We have not.  To tell you the truth, I

3   don't think I could afford to pay for it.

4   Q.          Okay.  Did you ever pay for home help

5   before the accident?

6   A.          No.

7   Q.          You never did?

8               What chores do you do around the house

9   now?

10  A.          Now?

11  Q.          Yes.

12  A.          Well, I pick things up.  I mean, you

13  straighten things up.  I can do some dusting.

14  Some I can't because if it's something low, I

15  can't -- I can't reach it.  I can make the bed

16  now.  Not a lot --

17  Q.          Okay.

18  A.          -- unfortunately.

19  Q.          Can you think of some things you used

20  to do that you don't do now --

21  A.          I --

22  Q.          -- in terms of home chores?

23  A.          I don't run the sweeper.  I can't clean

24  the floors.  I don't have -- haven't done the

61

1    it happened?

2    A.          No.

3    Q.          And the last time you would have been

4    at the store was?

5    A.          Probably in June sometime.

6    Q.          With the flowers?

7    A.          With the flowers.

8    Q.          Okay.  I know we've spoken about a lot

9    of things.  Is there anything else -- any other

10   effect your injuries have on you?  And I know that

11   you know you still have problems.  Anything else

12   that your injuries are affecting in your daily

13   life?

14   A.          Well, I mean, they -- they effect

15   everything I do.  I mean, everything is a lot more

16   difficult.  Everything has to be planned out ahead

17   of time.  You know, how far can I go.  Do I need

18   to take my wheelchair with me.  What's the weather

19   like.  You know, I'm not going to go out in the

20   rain.  Just -- a lot more cautious.  And basically

21   I don't see anything around me any more because I

22   look at the ground, watching where I'm walking at

23   all times.

24   Q.          Do you drive?

62

1   A.       I do.

2   Q.       You do drive?

3   A.       Yes.

4   Q.       Okay.  I think those are all the

5   questions I have.  Thanks.

6          MR. ROURKE:  We'll reserve the right to

7   read.

8          THE WITNESS:  You're welcome.

9          (Signature not waived.)

10          - - - - - -

11          Thereupon, the foregoing proceedings

12          concluded at 11:06 a.m.

13          - - - - -

14

15

16

17

18

19

20

21

22

23

24